IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RUTH WISEMAN,

    *Plaintiff*,

v.

FIRST MARINER BANK, *et al.*,

    *Defendants*.

Civil Action No. ELH-12-2423

**MEMORANDUM OPINION**

This case arises from a reverse mortgage transaction. Ruth Wiseman, plaintiff, and her late husband, John H. Wiseman, Sr., entered into a reverse mortgage for their home in Severna Park, Maryland (the "Residence") in 2009.[1] At that time, the Wisemans were both elderly and living on a fixed income, and Mr. Wiseman was in declining health. *See* Amended Complaint *Id.* ¶¶ 22-23, 28. Defendant First Mariner Bank ("First Mariner") was the lender for the reverse mortgage, and defendant Charles J. Pastore, a loan originator and broker, acted as First Mariner's agent; he recommended the reverse mortgage transaction to the Wisemans and arranged for it. *Id.* ¶¶ 26-27 (ECF 33). The reverse mortgage was serviced by defendant MetLife Home Loans, LLC ("MetLife").

---

[1] The United States Court of Appeals for the D.C. Circuit recently explained the concept of a "reverse mortgage" in *Bennett v. Donovan*, 703 F.3d 582, 584-85 (D.C. Cir. 2013):

> A "reverse mortgage" is a form of equity release in which a mortgage lender (typically, a bank) makes payments to a borrower based on the borrower's accumulated equity in his or her home. Unlike a traditional mortgage, in which the borrower receives a lump sum and steadily repays the balance over time, the borrower in a reverse mortgage receives periodic payments (or a lump sum) and need not repay the outstanding loan balance until certain triggering events occur (like the death of the borrower or the sale of the home). Because repayment can usually be deferred until death, reverse mortgages function as a means for elderly homeowners to receive funds based on their home equity.

Before the Wisemans entered into the reverse mortgage, they owned the Residence jointly, as tenants by the entireties. *Id.* ¶ 21. On the basis of Mr. Pastore's alleged advice and recommendation, Ms. Wiseman conveyed her interest in the Residence to Mr. Wiseman in conjunction with the reverse mortgage transaction, reserving to herself "a remainder interest to title by means of a life estate deed." *Id.* ¶ 32.

Mr. Wiseman passed away on or about December 13, 2011. *Id.* ¶ 39. Within one month, MetLife began contacting Ms. Wiseman, stating that the loan secured by the reverse mortgage was in default and that Ms. Wiseman was required to satisfy immediately the full balance due on the loan or be dispossessed of her home. *Id.* ¶ 40. MetLife sent notices of default and other communications to Ms. Wiseman asserting this position, and sent agents to "photograph, trespass upon, and attempt to gain access to, the Wiseman Residence." *Id.* ¶ 41. Despite Ms. Wiseman's attempts to "inform" MetLife that, under the terms of the reverse mortgage transaction, the loan was not in default so long as she was alive, *id.* ¶ 42, MetLife persisted in its "efforts to declare default and remove Ruth Wiseman from her home." *Id.* ¶ 43.

Accordingly, Ms. Wiseman initiated suit, asserting causes of action under federal and Maryland state law. In addition to First Mariner, Mr. Pastore, and MetLife, she has sued Resource Real Estate Services, LLC ("Resource"), the company that conducted the settlement of the reverse mortgage transaction, and has named as "interested parties" the Estate of John H. Wiseman (the "Estate") and Shaun Donovan, in his capacity as Secretary of Housing and Urban Development ("HUD").[2]

---

[2] Ms. Wiseman filed suit in the Circuit Court for Anne Arundel County, Maryland on or about June 14, 2012. *See* Complaint (ECF 2). On August 15, 2012, First Mariner and Mr. Pastore, who were the only defendants who had been served at that time, timely removed the suit

Ms. Wiseman's complaint includes eleven counts.  Count 1 asserts a cause of action for "Predatory Lending" against First Mariner, Pastore, and Resource.  Count 2 charges negligent misrepresentation, also against First Mariner, Pastore, and Resource.  Count 3 alleges that First Mariner and Pastore violated the Maryland Consumer Protection Act ("CPA"), Md. Code (2005 Repl. Vol., 2012 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L.").

Count 4 is captioned "Breach of Contract – Reformation" and names First Mariner, Pastore, and Resource as defendants; it seeks rescission or reformation of the life estate deed and reformation of the note and deed of trust securing the reverse mortgage, on the basis of "mutual mistake," because the parties allegedly intended that the Wisemans would both be able to reside in the Residence until death.  Count 5, captioned "Intentional Misrepresentation – Rescission," also seeks rescission or reformation of the life estate deed and reformation of the note and deed of trust, on the basis of intentional misrepresentation by First Mariner, Pastore, and Resource.  Count 6 asserts the tort of intentional misrepresentation by concealment (also known as fraudulent concealment) against First Mariner, Pastore, and Resource.  Count 7 is captioned "Breach of Contract – Reformation," the same caption as Count 4; unlike Count 4, however, Count 7 is asserted against all defendants, and seeks rescission or reformation of the life estate deed and reformation of the note and deed of trust, on the basis that the documents do not comply with the federal Home Equity Conversion Mortgage statute ("HECM"), 12 U.S.C.

---

to federal court on the basis of federal question jurisdiction, with supplemental jurisdiction over plaintiff's state law claims.  *See* 28 U.S.C. §§ 1331, 1367, 1441, 1446.  Plaintiff subsequently filed her Amended Complaint, which is the operative pleading.  In her original Complaint, Ms. Wiseman had named a fifth defendant, the Federal National Mortgage Association ("Fannie Mae").  However, she filed a notice of voluntary dismissal as to Fannie Mae, *see* ECF 15, and did not name Fannie Mae as a defendant in her Amended Complaint.  Hereafter, references to plaintiff's "complaint" refer to the Amended Complaint, unless otherwise noted.

§ 1715z-20, a provision of the National Housing Act ("NHA"), codified as amended at 12 U.S.C. §§ 1701 *et seq.* Count 8 asserts negligence against First Mariner, Pastore, and Resource.

Count 9 asserts claims against MetLife and Resource under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 *et seq.*, and the Maryland Consumer Debt Collection Act ("MCDCA"), C.L. §§ 14-201 *et seq.* Count 10, captioned "Statutory Violations Generally," asserts against all defendants violations of the HECM statute and its implementing regulations, *see* 24 C.F.R. part 206; the Maryland Reverse Mortgage Loans Act ("Reverse Mortgage Act"), C.L. §§ 12-1201 *et seq.*; and 15 U.S.C. § 1648, which is a provision of the federal Truth In Lending Act ("TILA"), codified as amended at 15 U.S.C. §§ 1601 *et seq.*, governing reverse mortgages. Finally, Count 11 asserts that Resource is liable as an aider and abettor of First Mariner and Pastore.

To summarize with respect to each defendant: Resource is named as defendant in all counts except Count 3, which asserts claims under the CPA; First Mariner and Pastore are named as defendants in all counts except Count 9, which asserts claims under the FDCPA and MCDCA, and Count 11, which asserts an aiding and abetting theory of liability against Resource; and MetLife is a defendant only as to Count 7 (breach of contract), Count 9 (FDCPA & MCDCA), and Count 10 ("Statutory Violations Generally").

Two motions are now pending for decision. Resource has filed a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed. R. Civ. P. 12(b)(6) ("Resource Motion") (ECF 36). After filing an answer to the complaint, *see* ECF 35, First Mariner and Pastore (collectively, "Mariner Defendants") filed a motion for judgment on the

pleadings, pursuant to Fed. R. Civ. P. 12(c) ("Mariner Motion") (ECF 40).[3]  Both motions have

been fully briefed,[4] and no hearing is necessary to resolve them.  *See* Local Rule 105.6.  For the

reasons that follow, both motions will be granted in part and denied in part.

## Factual Background[5]

As noted, the Wisemans owned the Residence as tenants by the entireties, a form of joint

ownership under Maryland law that is available only to married couples, by which a couple holds

title to real estate as a couple, rather than as individuals.  *See generally Bruce v. Dyer*, 309 Md.

421, 426-31, 524 A.2d 777, 780-82 (1987).  One feature of a tenancy by the entireties is that both

spouses have the right of survivorship: when one spouse dies, the surviving spouse becomes

vested with sole title to the property by operation of law.  *See, e.g.*, *Hutson v. Hutson*, 168 Md.

182, 188, 177 A.2d 177, 179 (1935) (describing right of survivorship as "'[t]he most important

incident of tenancy by the entireties'") (quoting TIFFANY ON REAL PROPERTY).

In June 2009, when the reverse mortgage transaction took place, Mr. Wiseman was 78

years of age and Ms. Wiseman was 75.  Amended Complaint ¶ 22.  Mr. Wiseman was suffering

from lung cancer and kidney failure; as a consequence of these ailments, he used a walker or

other device for mobility.  *Id.* ¶ 28.  The Wisemans were retired and living on a fixed income.

---

[3] MetLife filed an answer to plaintiff's original Complaint.  *See* ECF 27.  However, MetLife did not join in either motion, nor has MetLife otherwise responded to the Amended Complaint.  Accordingly, MetLife's liability is not at issue in this Opinion.

[4] Plaintiff filed an opposition to the Resource Motion ("Resource Opp.") (ECF 38) (the opposition was erroneously flagged in the electronic filing system as a motion; the Clerk will be directed to administratively terminate it), and Resource filed a reply (ECF 39).  Plaintiff filed an opposition to the Mariner Motion ("Mariner Opp.") (ECF 43), and the Mariner Defendants filed a reply ("Mariner Reply") (ECF 46).

[5] The facts are drawn from plaintiff's complaint and are construed in her favor.

*Id.* ¶ 23.  They desired to find a financially feasible way to live in their Residence "for the remainder of their days."  *Id.* ¶ 24.

At some point in 2009, the Wisemans contacted First Mariner and Mr. Pastore.  *Id.* ¶ 26. According to plaintiff, Pastore "was acting as a mortgage broker and originating loans for and otherwise promoting and selling . . . reverse mortgage[s] for First Mariner . . . as [First Mariner's] agent."  *Id.*  Mr. Pastore met with the Wisemans in their home to discuss the prospect of a reverse mortgage and to obtain an application from the Wisemans.  *Id.* ¶ 27.  When Pastore met with the Wisemans he learned their ages and that Mr. Wiseman was in poor health.  *Id.* ¶ 28. Plaintiff also alleged that Mr. Wiseman's poor health would have been "readily apparent" to Mr. Pastore.  *Id.*

Pastore advised the Wisemans that "reverse mortgages were part of a program initiated by Congress and regulated by HUD designed particularly with the needs and circumstances of senior citizens in mind," and that they were "good candidates for the program."  *Id.* ¶ 29.   He also represented to the Wisemans that, by obtaining a reverse mortgage, they "could pay-off their exiting deed of trust note/mortgage with the proceeds of the new loan, but would not have to make any future payments of mortgage installments," because the reverse mortgage loan "would be repaid by sale of the property after they had both passed away or decided to sell or not to reside in their home any longer."  *Id.*   And, Pastore advised the Wisemans that, if they participated in First Mariner's reverse mortgage program, "then as long as they lived they would each be able to stay in their home."  *Id.* ¶ 30.  The Wisemans submitted an application to Pastore. *Id.* ¶ 31.

Subsequently, Mr. Pastore "recommended a [reverse mortgage] to the Wisemans that would accomplish not only the payoff of their existing deed of trust, but also allow for a lump sum payment of . . . $31,610.00." *Id.* ¶ 32. However, the reverse mortgage that "he advised them to obtain required Ruth Wiseman to convey her interest in their home to Mr. Wiseman granting unto herself a remainder interest to title by means of a life estate deed." *Id.* Pastore advised the Wisemans to execute a life estate deed based on the "misrepresentation" that doing so would allow Ms. Wiseman to become the sole owner of the Residence after Mr. Wiseman's death (in fact, she already enjoyed that right as a tenant by the entireties), and that doing so would allow Ms. Wiseman to "remain entitled to reside in the Wiseman Residence for the duration of her life without consequence" to the reverse mortgage. *Id.* ¶ 33. Based on Mr. Pastore's representations, the Wisemans agreed to enter into the reverse mortgage with the understanding that doing so would free them from "the burden of making a monthly installment payment on a note or mortgage," and that "they would each be able to reside in the property for the rest of their lives." *Id.* ¶ 34.

The settlement for the reverse mortgage took place on June 17, 2009, conducted by a representative of Resource at the Residence, due to the Wisemans' limited mobility. *Id.* ¶¶ 34-35. Plaintiff alleges that "Resource authored and/or prepared all documentation necessary to complete the transaction," including a "Life Estate Deed," a "Fixed Rate Home Equity Conversion Deed of Trust" ("Deed of Trust"), and a Note, *id.* ¶¶ 35, 38,[6] and its agent presented

---

[6] A copy of the Life Estate Deed, which is titled "Deed, Fee Simple, Reservation of a Life Estate," was submitted by the Mariner Defendants as Exhibit B to the Mariner Motion. *See* ECF 40-4. A copy of the Deed of Trust was submitted as Exhibit D to the Mariner Motion. *See* ECF 40-6. A copy of the Note, entitled "Fixed Rate Note Closed End (Home Equity Conversion)," was submitted as Exhibit C to the Mariner Motion. *See* ECF 40-5.

these documents to the Wisemans. *Id.* ¶ 35. Plaintiff alleges that the Life Estate Deed was "prepared by Resource at the request or instruction of Pastore and/or First Mariner." *Id.* ¶ 36. The Wisemans both executed the Life Estate Deed, under which the Wisemans, as tenants by the entireties, granted a life estate to Mr. Wiseman, as grantee, with a remainder interest to Ms. Wiseman. *See* Life Estate Deed at 1-2. Only Mr. Wiseman signed the Note and the Deed of Trust.[7] *See* Note at 3; Deed of Trust at 6. Resource caused the documents to be recorded in the Land Records of Anne Arundel County. Amended Complaint ¶ 36.

According to plaintiff, the "counseling received by Ruth Wiseman" prior to entering into the transaction "did not include an explanation or assessment of the risk inherent in participating in the reverse mortgage" or of "the legal impact or consequences of the requirement that she convey her interest in her home to her husband." *Id.* ¶ 37. And, she "did not understand the consequences of doing so" or the "terms of the promissory note or deed of trust." *Id.*

As noted, Mr. Wiseman died on or about December 13, 2011. *Id.* ¶ 39. Thereafter, MetLife, the servicer of the reverse mortgage, asserted that the Note was in default, and began "frequently calling the Wiseman Residence at all hours of the day and evening, sending numerous notices of default and other demands, and even sent individuals to photograph, trespass upon, and attempt to gain access to, the Wiseman Residence." *Id.* ¶ 41. Despite several attempts by Ms. Wiseman and her adult son to convince MetLife that it was mistaken, *see id.* ¶ 42, MetLife persisted in its "efforts to declare default and remove Ruth Wiseman from her

---

[7] Although Ms. Wiseman did not sign the Deed of Trust, it defined the "Grantor" as "John H. Wiseman, Sr., as sole owner and Ruth M. Wiseman as remainderman." Deed of Trust at 1. Plaintiff also alleges that Mr. Wiseman executed a "Second Note" and "Second Deed of Trust" in favor of HUD, pursuant to the HECM statute. Amended Complaint ¶ 38. Copies of the Second Note and Second Deed of Trust are not contained in the record.

home." *Id.* ¶ 43. Plaintiff alleges that the "actions of MetLife caused Ruth Wiseman, now a woman of seventy-eight (78) years to suffer severe emotional distress and mental anguish, to such an extent that she became fearful of answering her phone or opening the front door of her own home without family present." *Id.* ¶ 44.

Additional facts will be included in the Discussion.

## Discussion

### A. Standard of Review

Resource has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and the Mariner Defendants have moved for judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c). A motion pursuant to Rule 12(b)(6) constitutes an assertion by the defendant that, even if the facts alleged by the plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." A Rule 12(b)(6) motion must be filed "before pleading if responsive pleading is allowed." However, pursuant to Fed. R. Civ. P. 12(h)(2)(B), which governs the time when defenses may be raised, a defendant may also assert "[f]ailure to state a claim upon which relief can be granted" in "a motion under Rule 12(c)." A Rule 12(c) motion for "judgment on the pleadings" may be filed "[a]fter the pleadings are closed," so long as it is "early enough not to delay trial." Regardless of whether failure to state a claim for relief is asserted in a Rule 12(b)(6) motion or a Rule 12(c) motion, the standard of review is the same: courts apply "the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6)." *Burbach Broadcasting Co. of Del. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2). It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 n.3 (2007).

A plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Id.* at 555. But, the rule demands more than bald accusations or mere speculation. *Id.*; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). To satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556. A complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient. *Id.* at 555.

Both *Twombly*, 550 U.S. 544, and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), make clear that, in order to survive a motion under Rule 12(b)(6) (or Rule 12(c)), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see Iqbal*, 556 U.S. at 684 ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Simmons v. United Mortg. & Loan Inv.*, 634 F.3d 754, 768 (4th Cir. 2011); *Andrew v. Clark*, 561 F.3d 261, 266 (4th Cir. 2009); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). Thus, the defendant's motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679 (citation omitted).

In reviewing such a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted). However, the court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385-86 (4th Cir. 2009), *cert. denied*, 130 S. Ct. 1740 (2010).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy he or she seeks. *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1960 (2012). "'Dismissal under Rule 12(b)(6) [or judgment for the defendant under Rule 12(c)] is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory.'" *Hartmann v. Calif. Dept. of Corr. & Rehab.*, 707 F.3d 1114, 1122 (9th Cir. 2013) (citation omitted); *accord Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011) ("When reviewing a 12(b)(6) dismissal, 'we must determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed.' Dismissal is appropriate if the law simply affords no relief.") (internal citation omitted).

A motion asserting failure of the complaint to state a claim typically "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v.*

*City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (internal quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint. In addition, a court "[o]rdinarily . . . may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013). In considering a challenge to the adequacy of plaintiff's pleading, however, the court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic." *Philips v. Pitt County Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also E.I. du Pont de Nemours & Co.*, 637 F.3d at 448. To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).

The Life Estate Deed, the Note, and the Deed of Trust are explicitly discussed in the complaint and are integral to plaintiff's claims. They are legal instruments whose "'very existence'" has an operative effect on the rights at issue in the suit. *Id.* (citation omitted). Accordingly, they are proper subjects of consideration under Rule 12(b)(6) and Rule 12(c), and there is no dispute as to the authenticity of the copies submitted by the Mariner Defendants.

The Mariner Defendants have also submitted another document, a "Certificate of HECM Counseling" ("Counseling Certificate"), as Exhibit A to the Mariner Motion (ECF 40-3). The Counseling Certificate was prepared and signed by Pamela Bilal, a Housing Counselor with the Howard County Office on Aging, a "HUD-Approved Counseling Agency," and was also signed by Mr. and Ms. Wiseman in May 2009. Although the complaint refers ambiguously to

"counseling" that plaintiff received, the Counseling Certificate is not expressly mentioned in the complaint and does not appear to be integral to plaintiff's claim. Plaintiff has submitted a "Representation of Total Annual Loan Cost Rate" ("Loan Terms") Ex.1 to Mariner Opp. (ECF 43-1), which she contends was prepared by Ms. Bilal as part of the counseling program that produced the Counseling Certificate. Plaintiff asserts that, if the Court considers the Counseling Certificate, it should also consider the Loan Terms under the "rule of completeness." Mariner Opp. at 2 n.1.

Although documents that are not integral to the complaint ordinarily may not be considered in a challenge to the pleading, Fed. R. Civ. P. 12(d) grants a court discretion to consider "matters outside the pleadings" on "a motion under Rule 12(b)(6) or 12(c)." However, if the court does so, it must treat the motion "as one for summary judgment under Rule 56," Fed. R. Civ. P. 12(d), must give all parties "a reasonable opportunity to present all the material that is pertinent to the motion," *id.*, and must give the parties notice of its intent to consider the motion under a summary judgment standard. *See Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials."); *accord Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).

For reasons explained *infra*, I have not considered the Counseling Certificate or the Loan Terms in my ruling on the Mariner Motion. Accordingly, the Mariner Motion need not be considered as one for summary judgment pursuant to Rule 12(d).

<u>B.  Predatory Lending</u>

Resource and the Mariner Defendants both argue for dismissal of Count 1 on the ground that "predatory lending," as such, is not a recognized cause of action in Maryland.[8]  They correctly observe that no reported Maryland appellate decision has recognized such a cause of action in tort.

Defendants also rely on several cases in which judges in this district have dismissed claims alleging "predatory lending" where the plaintiffs failed to "cite any law that [the defendants] violated by engaging in . . . allegedly predatory behavior" or otherwise "provide a plausible legal basis for [their] predatory lending claim[s]."  *Willis v. Countrywide Home Loans Serv'g*, Civ. No. CCB-09-1455, 2009 WL 5206475, at *8 (D. Md. Dec. 23, 2009); *see id.*, 2010 WL 2857801, at *3 (D. Md. July 19, 2010) (dismissing subsequent amended complaint because limitations had expired as to statutes asserted as basis for "predatory lending" claim).  *See also Smart v. Decision One Mortg. Co., LLC*, Civ. No. AW-10-320, 2011 WL 829212, at *2 (D. Md. Mar. 7, 2011) (dismissing count of "Predatory Lending Practices" where "[p]laintiffs never specif[ied] . . . what they mean[t] by 'Predatory Lending Practices,' despite [defendant's]

---

[8] All of the state law claims in this case arise under Maryland law.  "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state."  *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011) (citing, *inter alia*, *ITCO Corp. v. Michelin Tire Corp.*, 722 F.2d 42, 49 n.11 (4th Cir. 1983), *cert. denied*, 469 U.S. 1215 (1985)).  Maryland is, of course, the forum state of this Court.  Under Maryland's choice-of-law principles, tort claims are governed by the law of the state where the alleged harm occurred ("*lex loci delicto*").  *See, e.g.*, *Proctor v. Washington Metropolitan Area Transit Auth.*, 412 Md. 691, 726, 990 A.2d 1048, 1068 (2010).  And, contract claims are ordinarily governed by the law of the state where the contract was made ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another jurisdiction.  *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995).  All events alleged in the complaint occurred in Maryland.

repeated contention that no such cause of action exists under Maryland law"); *Davis v. Wilmington Fin., Inc.*, Civ. No. PJM-09-1505, 2010 WL 1375363, at *7 (D. Md. Mar. 26, 2010) (dismissing claim that consisted of "vague allegations and labels of 'predatory lending'" in "'violation of the local Civil Code'" because complaint "fail[ed] to articulate any purported act of predatory lending by any Defendant, and fail[ed] to cite the 'local Civil Code' upon which Plaintiffs [sought] to base their claim") (quoting complaint).

In particular, defendants rely on the decision of Judge Quarles in *Sucklal v. MTGLQ Investors LP*, Civ. No. WDQ-10-1536, 2011 WL 663754 (D. Md. Feb. 14, 2011). In that case, Judge Quarles observed that "predatory lending" is simply "a term that describes 'abusive practices in home mortgage lending.'" *Id.* at *4 (citation omitted). He opined that, "[t]o state a predatory lending claim," a plaintiff must plead "facts that would support a 'reasonable inference' that the defendants engaged in abusive lending practices," and "must allege the specific law violated by the defendant's predatory behavior." *Id.* (citation omitted).

In opposition to both motions, plaintiff accepts the pleading standard articulated by Judge Quarles in *Sucklal*, requiring the plaintiff to specify a statutory cause of action as the basis for such a claim, and asserts that Count 1 states a claim for violation of the Maryland Mortgage Fraud Protection Act ("MMFPA"), Md. Code (2010 Repl. Vol., 2012 Supp.), §§ 7-401 *et seq.* of the Real Property Article ("R.P.").[9] The MMFPA prohibits the commission of "mortgage fraud," R.P. § 7-402, which is defined in R.P. § 7-402(d) as:

---

[9] Plaintiff does not urge this Court to recognize a new, freestanding cause of action in tort for "predatory lending" under Maryland law. Even if she did, the Court would not be at liberty to accept her invitation. *See Guy v. Travenol Labs., Inc.*, 812 F.2d 911, 915 (4th Cir. 1987) (stating that a "federal court sitting in diversity simply cannot compel a state to provide a cause of action in tort"); *accord Burris Chem., Inc. v. USX Corp.*, 10 F.3d 243, 247 (4th Cir. 1993)

[A]ny action by a person made with the intent to defraud that involves:

(1) Knowingly making any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(2) Knowingly creating or producing a document for use during the mortgage lending process that contains a deliberate misstatement, misrepresentation, or omission with the intent that the document containing the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(3) Knowingly using or facilitating the use of any deliberate misstatement, misrepresentation, or omission during the mortgage lending process with the intent that the misstatement, misrepresentation, or omission be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process;

(4) Receiving any proceeds or any other funds in connection with a mortgage closing that the person knows resulted from a violation of item (1), (2), or (3) of this subsection;

(5) Conspiring to violate any of the provisions of item (1), (2), (3), or (4) of this subsection; or

(6) Filing or causing to be filed in the land records in the county where a residential real property is located, any document relating to a mortgage loan that the person knows to contain a deliberate misstatement, misrepresentation, or omission.

In turn, the "mortgage lending process" encompasses the entire "process by which a person seeks or obtains a mortgage loan," R.P. § 7-401(e)(1), including the "solicitation, application, origination, negotiation, servicing, underwriting, signing, closing, and funding of a mortgage loan," *id.* § 7-401(e)(2)(i), and the "notarizing of any document in connection with a mortgage loan." *Id.* § 7-401(e)(2)(ii). Among other enforcement mechanisms, the MMFPA authorizes a private right of action for damages, attorneys' fees, and treble damages. *Id.* § 7-406.

In response to plaintiff's invocation of the MMFPA, defendants correctly observe that the MMFPA was never mentioned in plaintiff's complaint, and protest that "'[i]t is axiomatic that a

("[T]he federal courts sitting in diversity rule upon state law as it exists and do not surmise or suggest its expansion.") (citing cases declining to create novel state law causes of action).

complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Sager v. Hous. Comm'n of Anne Arundel County*, 855 F. Supp. 2d 524, 557 (D. Md. 2012) (quoting *Arbitraje Casa de Cambio, S.A. v. U.S. Postal Serv.*, 297 F. Supp. 2d 165, 170 (D.D.C. 2003)).

I agree with defendants that the complaint does not expressly allege a violation of the MMFPA. Accordingly, I will dismiss Count 1, without prejudice, and with leave to amend the suit to assert a claim under the MMFPA.[10]

### C. Fraud

Several counts of plaintiff's complaint sound in fraud. Count 5 seeks rescission of the Life Estate Deed on the basis of fraudulent inducement. Count 6 asserts the tort of fraudulent concealment. And, Count 3 alleges violation of the CPA, an anti-fraud statute. Defendants argue that plaintiff has not satisfied the elements of a claim of fraud.

#### 1. Rule 9(b) Pleading Standard

Claims that sound in fraud, regardless of whether they are claims at common law or arise under an anti-fraud statute, implicate the heightened pleading standard of Fed. R. Civ. P. 9(b). *See, e.g.*, *E-Shops Corp. v. U.S. Bank N.A.*, 678 F.3d 659, 665 (8th Cir. 2012) ("Rule 9(b)'s heightened pleading requirement also applies to statutory fraud claims."); *see also Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (stating that a Maryland CPA claim

---

[10] Even if a count captioned as "predatory lending" might be sufficient to survive a motion to dismiss if in substance it asserted a cause of action under a particular statute, better pleading practice would be to dispense with the legally meaningless "predatory lending" label and simply plead the statutory cause of action. Plaintiff is cautioned that judges in this district have determined that claims under the MMFPA "sound[ ] in fraud" and thus are "subject to Rule 9's heightened pleading requirements," discussed *infra*. *Currie v. Wells Fargo Bank, N.A.*, ___ F. Supp. 2d ___, 2013 WL 2295695, at *9 (D. Md. May 23, 2013); *accord Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC*, ___ F. Supp. 2d ___, 2013 WL 932525, at *26 (D. Md. Mar. 11, 2013).

that "sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b)").

Rule 9(b) states: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Under the rule, a plaintiff alleging claims that sound in fraud "'must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.'" *United States ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010) (citation omitted). In other words, "'Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story.'" *Crest Construction II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011) (citation omitted).

Rule 9(b) serves several salutary purposes:

> "First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Notably, however, Rule 9(b) by its plain text permits general averment of aspects of fraud that relate to a defendant's state of mind. And, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Id.* Moreover, Rule 9(b) is "less strictly applied with respect to claims of fraud by concealment" or omission of material facts, as

opposed to affirmative misrepresentations, because "an omission 'cannot be described in terms of the time, place, and contents of the misrepresentation or the identity of the person making the misrepresentation.'" *Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 552 (D. Md. 1997) (quoting *Flynn v. Everything Yogurt*, Civ. No. HAR-92-3421, 1993 WL 454355, at *9 (D. Md. Sept. 14, 1993)); *accord Gadson v. Supershuttle International*, Civ. No. AW-10-1057, 2011 WL 1231311, at * 9 (D. Md. Mar. 30, 2011).

### 2. *Maryland Law of Fraud*

Under Maryland law, "'[f]raud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement.'" *Sass v. Andrew*, 152 Md. App. 406, 432, 832 A.2d 247, 261 (2003) (citation omitted). Regardless of the particular theory, the plaintiff must establish the elements of fraud "by clear and convincing evidence." *Md. Envir. Trust v. Gaynor*, 370 Md. 89, 97, 803 A.2d 512, 516 (2002).

In an action for fraudulent misrepresentation (which is the garden variety of fraud and often is described simply as "fraud"), the plaintiff ordinarily must show:

> 1) that the defendant made a false representation to the plaintiff;
>
> 2) that its falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth;
>
> 3) that the misrepresentation was made for the purpose of defrauding the plaintiff;
>
> 4) that the plaintiff relied on the misrepresentation and had the right to rely on it; and
>
> 5) that the plaintiff suffered compensable injury resulting from the misrepresentation.

*Nails v. S&R, Inc.*, 334 Md. 398, 415, 639 A.2d 660, 668 (1994); *accord Thomas v. Nadel*, 427 Md. 441, 451 n.18, 48 A.3d 276, 282 n.18 (2012); *Sass*, 152 Md. App. at 429, 832 A.2d at 260.

To be actionable, a false representation "must be of a material fact." *Gross v. Sussex,*

*Inc.*, 332 Md. 247, 258, 630 A.2d 1156, 1161 (1993).  "A 'material' fact is one on which a reasonable person would rely in making a decision," *Sass*, 152 Md. App. at 430, 832 A.2d at 260, or a fact that "'the maker of the misrepresentation knows . . . [the] recipient is likely to regard . . . as important.'"  *Gross*, 332 Md. at 258, 630 A.2d at 1161 (citation omitted).  The "misrepresentation must be made with the deliberate intent to deceive," *Sass*, 152 Md. App. at 430, 832 A.2d at 260 (citing *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188 (1998)), and the defendant must "know[ ] that his representation is false" or be "recklessly indifferent in the sense that he knows that he lacks knowledge as to its truth or falsity."  *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 232, 652 A.2d 1117 (1995).

A mere failure to disclose a material fact does not constitute fraud, in the absence of a legal duty to disclose that inheres in certain types of transactions, because "Maryland recognizes no general duty upon a party to a transaction to disclose facts to the other party."  *Gaynor*, 370 Md. at 97, 803 A.2d at 516.  However, "[e]ven in the absence of a duty of disclosure, one who *suppresses or conceals facts which materially qualify representations made* to another may be guilty of fraud."  *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 239, 469 A.2d 867 (emphasis added), *cert. denied*, 300 Md. 88, 475 A.2d 1200 (1984), *cert. denied*, 469 U.S. 1215 (1985).

A fraud based on active suppression or concealment of material facts or an intentional failure to disclose facts that the defendant is legally obligated to disclose is the variety of fraud referred to as "fraudulent concealment."  With respect to active suppression or concealment of facts, "Fraudulent Concealment 'is any statement or other conduct which prevents another from acquiring knowledge of a fact, such as diverting the attention of a prospective buyer from a defect which otherwise, he would have observed.'"  *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108,

138, 916 A.2d 257, 274 (2007). In other words, it describes a "situation where the defendant actively undertakes conduct or utters statements designed to, or that would, divert attention away from" a material fact. *Id.* at 138 n.11, 916 A.2d at 274 n.11.

"'To create a cause of action, concealment must have been intentional and effective—the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact. The affirmative suppression of the truth must have been with intent to deceive.'" *Fegeas v. Sherrill*, 218 Md. 472, 476-77, 147 A.2d 223, 225-26 (1958) (citation omitted); *accord Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 524, 958 A.2d 385, 390 (2008). As the *Rhee* Court explained, *id.* at 536, 958 A.2d at 396 (internal citation omitted) (alterations in *Rhee*):

> [T]he concealment or suppression [of a material fact] is in effect a representation that what is disclosed is the whole truth. The gist of the action [for fraud] is fraudulently producing a false impression upon the mind of the other party; and if this result is accomplished, it is unimportant whether the means of accomplishing it are words or acts of the defendant . . . .

A "claim of failure to disclose, on the other hand, requires only that the defendant remain silent about, or omit, facts," and is not actionable unless "the defendant had a duty to disclose." *Lloyd*, 397 Md. at 138 n.11, 916 A.2d at 274 n.11. Where the fraudulent concealment claim is based on a duty to disclose, Maryland courts have formulated the elements of the cause of actions as follows:

> "(1) [T]he defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Blondell v. Littlepage*, 413 Md. 96, 119, 991 A.2d 80, 94 (2010) (quoting *Lloyd*, 397 Md. at 138, 916 A.2d at 274) (emphasis omitted).

The Maryland Court of Appeals encapsulated the foregoing principles in *Frederick Road Limited Partnership v. Brown & Sturm*, 360 Md. 76, 100 n.14, 756 A.2d 963, 976 n.14 (2000) (internal citations omitted):

> Ordinarily, non-disclosure does not constitute fraud unless there exists a duty of disclosure. Absent a fiduciary relationship, this Court has held that a plaintiff seeking to establish fraudulent concealment must prove that the defendant took affirmative action to conceal the cause of action and that the plaintiff could not have discovered the cause of action despite the exercise of reasonable diligence, and that, in such cases, the affirmative act on the part of the defendant must be more than mere silence; there must be some act intended to exclude suspicion and prevent injury, or there must be a duty on the part of the defendant to disclose such facts, if known.

"The tort of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 165 Md. App. 665, 674, 886 A.2d 924, 929 (2005) (quoting *Sec. Constr. Co. v. Maietta*, 25 Md. App. 303, 307, 334 A.2d 133, 136 (1975)). In other words, it incorporates all of the elements of fraudulent misrepresentation or fraudulent concealment, with the added element that the defendant's fraud led the plaintiff to enter into a detrimental contractual agreement. "In fraudulent inducement cases, a defrauded party may elect between two remedies, which are exclusive." Paul Mark Sandler & James K. Archibald, PLEADING CAUSES OF ACTION IN MARYLAND § 3.92, at 346 (5th ed. 2013) ("PLEADING CAUSES OF ACTION"). "Persons who discover that they have been induced into a contract by fraud must decide, or the law will decide for them, whether unilaterally to rescind the contract or to ratify the contract and seek damages, either affirmatively or by recoupment." *Sonnenberg v. Sec. Mgmt. Corp.*, 325 Md. 117, 127, 599 A.2d 820, 823 (1992). The prerequisites to obtain rescission of a contract or other instrument are discussed, *infra*.

### 3. Fraud Claims Against Resource

Resource argues that plaintiff's fraud claims fail because the complaint does not clearly allege, under Rule 9(b) standards or otherwise, that Resource made any misrepresentations to plaintiff. Rather, the alleged misrepresentations were made by the Mariner Defendants. Moreover, with regard to fraudulent concealment, Resource reasons that the complaint fails to establish any basis for imputing a duty on Resource to make any particular disclosures to plaintiff.[11]

I agree with Resource that plaintiff fails to describe the actual content of any misrepresentation made by Resource. Although Ms. Wiseman's complaint pleads a specific misrepresentation on the part of Pastore, that "as long as [the Wisemans] lived they would each be able to stay in their home," Amended Complaint ¶ 30, the complaint contains no comparable allegations regarding any specific misrepresentation made by Resource or its employee who conducted the closing of the reverse mortgage (who, in any event, has not been identified). Although the complaint alleges that Resource's employee visited "the Wiseman Residence on June 17, 2009, to conduct the settlement of the loan," there is no evidence that Resource made any representation at that time beyond what was contained in the "loan arranged and recommended by Pastore." *Id.* ¶ 34.

Moreover, I agree that, on the facts as pleaded, plaintiff has articulated no basis to impose a duty of disclosure on Resource. Resource relies upon a recent decision of the Maryland Court

---

[11] Resource also maintains that the complaint establishes no basis to hold it vicariously liable for any fraud committed by the Mariner Defendants, because the Mariner Defendants were not Resource's employees or agents. Plaintiff does not argue in her Opposition that her claims against Resource arise under a theory of vicarious liability, nor does she expressly plead such a theory in her complaint. Accordingly, I need not further consider Resource's potential vicarious liability.

of Special Appeals, *Iglesias v. Pentagon Title & Escrow, LLC*, 206 Md. App. 624, 51 A.3d 51

(2012), *cert. denied*, 430 Md. 346, 61 A.3d 19 (2013), which is illuminating.  In that case, the

plaintiff, Iglesias, had been the victim of an identity fraud scheme, whereby another person had

purchased two parcels of real property in Iglesias's name, using a forged power of attorney.  The

court considered whether Pentagon, the company that conducted the settlements of the real estate

transactions (and an individual member of Pentagon who acted as the settlement agent), owed a

duty in tort to Iglesias to detect and disclose the fraud.

The *Iglesias* Court explained the standard under Maryland law for recognition of a tort

duty in cases involving economic loss, drawn from the seminal case of *Jacques v. First National

Bank of Maryland*, 307 Md. 527, 515 A.2d 756 (1986):

> "Where the failure to exercise due care creates a risk of economic loss only,
> courts have generally required an intimate nexus between the parties as a
> condition to the imposition of tort liability.  This intimate nexus is satisfied by
> contractual privity or its equivalent.  By contrast, where the risk created is one of
> personal injury, no such direct relationship need be shown, and the principal
> determinant of duty becomes foreseeability."

*Iglesias*, 206 Md. App. at 638, 51 A.3d at 59 (quoting *Jacques*, 307 Md. at 534-35, 515 A.2d at

759-60) (footnote and citations omitted in *Iglesias*). This doctrine is sometimes called the

"economic loss rule."  *See, e.g.*, *Farmers Bank of Md. v. Chicago Title Ins. Co.*, 163 Md. App.

158, 172, 877 A.3d 1145, 1153 (2005).

The *Iglesias* Court thought it "plain that Iglesias was not in contractual privity with

Pentagon," 206 Md. App. at 659, 51 A.3d at 72, because Iglesias did not actually participate in

the transaction at all; rather, an impostor falsely purporting to use her power of attorney

participated.[12] Moreover, similar to the relationship between Resource and the Wisemans, "Pentagon did not enter into any contractual relationship with Iglesias *or* her imposter. Rather, it was acting as an agent for the lender in each transaction to facilitate the closing of the subject loans." *Id.* at 660, 51 A.3d at 72 (emphasis in original). However, Iglesias argued that there were several "'red flags'" in the transactions that "should have put Pentagon on notice that fraud was afoot, and therefore created a circumstance akin to contractual privity, which gave rise to a duty on Pentagon's part to investigate whether a fraud was being perpetrated before allowing the sales to proceed." *Id.* at 661, 51 A.3d at 73. The *Iglesias* Court rejected this argument, reasoning that the power of attorney used by the impostor was facially valid. *Id.* at 663, 51 A.3d at 74.

Moreover, and of import here, Iglesias contended that there were "'irreconcilable discrepancies'" in the "loan documents prepared by the lender," *id.* at 664, 51 A.3d at 74-75, including that "it was highly unusual that [Iglesias] as a buyer was undertaking the sole obligation for the loans and [deeds of trust] but was obtaining only joint title to the properties" with another person (one of the fraudsters). *Id.* at 660-61, 51 A.3d at 73. Iglesias argued that these discrepancies also should have put Pentagon on notice that the transaction was fraudulent. The Maryland Court of Special Appeals disagreed, reasoning: "As the settlement agent, Pentagon was not charged with a duty to compare or investigate the lenders' closing documents. [I]ts obligation was to carry out the lenders' instructions and . . . there is nothing in the summary judgment record to show that Pentagon did not do so." *Id.* at 664, 51 A.3d at 75.

---

[12] The *Iglesias* Court rejected the argument that either Pentagon or the purchase money lender in the real estate transactions should have been considered in privity with Iglesias because they *thought* they were dealing with Iglesias, although actually dealing with an impostor. *See Iglesias*, 206 Md. App. at 654-56, 660, 51 A.3d at 69-70, 72.

Similarly, the complaint here affirmatively alleges that Resource carried out the instructions of the lender, First Mariner. *Iglesias* stands for the proposition that, absent extraordinary circumstances, a title company conducting a real estate closing is not "charged with a duty to compare or investigate the lenders' closing documents," *id.*, or to disclose to a purchaser that features of the transaction appear "highly unusual" and potentially detrimental to the purchaser. *Id.* at 660, 51 A.3d at 73.

Plaintiff argues that Resource's reliance on *Iglesias* is "misplaced," Resource Opp. at 5, because the *Iglesias* Court distinguished the case before it from two other cases, *Weisman v. Connors*, 312 Md. 428, 540 A.2d 783 (1988), and *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 762 A.2d 582 (2000), "in which the 'equivalent' of contractual privity was found to exist," because in "each of those cases, the parties met face-to-face and the defendant had specific knowledge that the plaintiff was taking actions in reliance on the defendant's conduct." *Iglesias*, 206 Md. App. at 653, 51 A.3d at 68. But, the facts alleged in the complaint give no indication that the Wisemans relied upon Resource's conduct or that Resource knew or should have known that the Wisemans placed special reliance on Resource to protect their interests.

To be sure, the complaint supports a reasonable inference that it would have been apparent to the Resource employee who conducted the closing that the Wisemans were elderly and that Mr. Wiseman, in particular, was in frail physical condition. But, without more, that does not impose a duty of care on Resource. I find salient what Judge Messitte said in *Biggs v. Eaglewood Mortgage, LLC*, 582 F. Supp. 2d 707 (D. Md. 2008), *aff'd*, 353 F. App'x 864 (4th Cir. 2009), *cert. denied*, ___ U.S. ___, 130 S. Ct. 3360 (2010), in response to elderly borrowers' claim that their mortgage lender owed them a tort duty not to "put[ ] them into [a type of loan],

the high risk features of which were not suitable for borrowers of their age and station." *Id.* at 718. He stated: "No authority stands for the proposition that banks owe a duty to elderly borrowers to place them in a more 'suitable' loan, even while the borrowers are actively seeking and ultimately agree to some other, more burdensome loan," at least so long as "there is no indication that the [borrowers] were suffering from mental disabilities that impaired their ability to enter into a loan contract." *Id.* at 719. In my view, Judge Messitte's observation has even greater force in the context of a claim that a settlement company has a duty to protect an elderly borrower from "unsuitable" loan terms than in a claim against a lender.

Plaintiff also suggests that a Maryland statute, C.L. § 12-119, establishes that "Resource was presumptively selected by the Wisemans with the understanding that [Resource] could act independent of, and not merely as an agent of, First Mariner." Resource Opp. at 5-6. I do not discern how C.L. § 12-119 establishes such a presumption. The statute requires a mortgage lender, under certain circumstances, to notify the borrower of the borrower's "ability to choose" an "attorney, title insurance company, or other person to perform settlement services relating to the purchase of the real property." C.L. § 12-119(b)(1)-(2). But, the statute does not purport to establish a presumption that a settlement agent acts as an agent of the borrower rather than the lender, nor does it establish any particular duty of disclosure that a settlement agent owes a borrower, and I have found no case law to that effect.

Accordingly, because the complaint alleges no misrepresentations by Resource or facts that would give rise to an affirmative duty of disclosure by Resource, plaintiff's fraud claims against Resource are not viable.

### 4. Fraud Claims Against the Mariner Defendants

In contrast to plaintiff's allegations against Resource, plaintiff's complaint does allege particular misrepresentations made by Pastore, on First Mariner's behalf.[13]  In particular, the complaint alleges that Pastore affirmatively represented to the Wisemans that the reverse mortgage would permit Ms. Wiseman to live in the Residence after Mr. Wiseman's death, for the rest of her life, without having to make payments on the loan.

The Mariner Defendants suggest that plaintiff's misrepresentation claims fail to comply with Rule 9(b) because she "fails to specifically allege the time or date at which the alleged statement was made."  Mariner Motion at 25.  However, a complaint "need not plead precise dates and times of the alleged misrepresentations" to comply with Rule 9(b).  *Petrakopoulou v. DHR Int'l, Inc.*, 626 F. Supp. 2d 866, 870 (N.D. Ill. 2009).  Rather, a complaint is sufficiently specific to meet the Rule 9(b) bar when it provides dates "or some other measure of precision and substantiation" of the particulars of the fraud alleged.  *Jurista v. Amerinox Processing, Inc.*, 492 B.R. 707, 751 (D.N.J. 2013).  *See, e.g.*, *Smith v. Bank of Am. Home Loans*, ___ F. Supp. 2d ___, 2013 WL 4080325, at *6 (M.D. Fla. Aug. 13, 2013) (holding that complaint satisfied Rule 9(b) where it did "not allege precise dates as to when alleged fraudulent statements were made," but alleged "the substance of the [fraudulent] statements, the Bank of America representatives who made the statements, and even provide[d] the statement maker's telephone extensions"); *Woodland Harvesting, Inc. v. Ga. Pac. Corp.*, 693 F. Supp. 2d 732, 739 (E.D. Mich. 2010) ("[A]bsolute precision is not necessarily needed and a complaint alleging that defendant made

---

[13] The Mariner Defendants analyze their alleged liability together and do not contend that the complaint fails to allege facts supporting vicarious liability of First Mariner for Pastore's conduct.  Accordingly, I need not discuss principles of vicarious liability with respect to the Mariner Defendants.

representations during meetings held between October 7, 1996 and January 10, 1997 [is] sufficient even though precise dates or locations were not provided," where "the complaint did specify the individuals who made and heard the alleged misrepresentations."). The core purpose of Rule 9(b) is to ensure that "the complaint provides the defendant with sufficient notice [to] answer and defend the claim." *Woodland Harvesting*, 693 F. Supp. 2d at 739.

Here, although the complaint does not identify the precise date on which the alleged misrepresentations were made, it makes clear that the misrepresentations were made by Pastore during a visit to the Wisemans' home in 2009 and in subsequent discussions that culminated in the closing of the reverse mortgage on June 17, 2009. I am "satisfied (1) that the defendant[s] ha[ve] been made aware of the particular circumstances for which [they] will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, *supra*, 176 F.3d at 784.

The Mariner Defendants' most substantial argument against plaintiff's fraud claims is that, assuming that the Mariner Defendants made false representations, the misrepresentations were not material and plaintiff's reliance on the representations was unreasonable, as a matter of law. This argument is based entirely on the Counseling Certificate that Mr. and Ms. Wiseman signed as a precursor to obtaining the loan. Specifically, the Mariner Defendants rely on a statement in the certificate that the "Home Equity Conversion Mortgage will be due and payable when no remaining borrower lives in the mortgaged property . . . . (Borrowers are those parties who have signed the Note and Mortgage or Deed of Trust.)." ECF 40-3. However, the Counseling Certificate constitutes matter outside the pleadings that cannot be considered unless the Mariner Defendants' motion is converted to a motion for summary judgment. In my view,

summary judgment is premature. No discovery has yet occurred. The factual circumstances of the counseling the Wisemans received and the specific advice they received from the counselor are not in evidence.[14] Also not in evidence is the explanation, if any, given to the Wisemans by Pastore regarding the effect of the Life Estate Deed on whether Ms. Wiseman would be considered a "borrower." Accordingly, this defense is not suitable for resolution at the motion to dismiss stage.

### D. Rescission and Reformation Claims

Plaintiff asserts several claims that seek reformation and/or rescission of the instruments comprising the reverse mortgage transaction. In particular, both Count 4 and Count 7 seek the remedy of rescission or reformation of the Life Estate Deed, and reformation of the Note and Deed of Trust, on the basis of alleged "mutual mistakes" in the transaction.[15] Count 5 argues fraudulent inducement as a basis to rescind or reform the Life Estate Deed and reform the Note and Deed of Trust.

Reformation and rescission are closely related equitable remedies. "Reformation differs from rescission in that a reformed document remains in force and effect, but in a modified form," so as to reflect the parties' true intent, PLEADING CAUSES OF ACTION § 2.23, at 126 (citing *Higgins v. Barnes*, 310 Md. 532, 538, 530 A.2d 724, 727 (1987)), while rescission "involves voiding the [instrument] *ab initio* and restoring the parties to their status prior to the

---

[14] Notably, plaintiff contends that, at the time the Wisemans received the counseling, the reverse mortgage arrangement they were contemplating did not include execution of a life estate deed and would have entailed both Mr. and Ms. Wiseman acting as borrowers.

[15] As noted, the differences between the two counts are that Count 4 is asserted against Resource and the Mariner Defendants, and is based on Pastore's representations that the Wisemans would be able to live in the Residence for both of their lives, while Count 7 is asserted against all defendants, and is based on the alleged failure of the transactional documents to comply with the HECM statute.

[transaction]." PLEADING CAUSES OF ACTION § 2.24, at 130 (citing *Creamer v. Helferstay*, 294 Md. 107, 448 A.2d 332 (1982), and *Dialist Co. v. Pulford*, 42 Md. App. 173, 399 A.2d 1374 (1979)).

Synthesizing the elements of a reformation claim from Maryland case law, the authors of PLEADING CAUSES OF ACTION state:

> To prevail on a claim for reformation of a written instrument, the plaintiff must allege and prove:
>
> 1) There was a mutual mistake . . . , or the instrument or contract was induced by fraud, duress, undue influence, or misrepresentation;
>
> 2) The written agreement or instrument was not the agreement or instrument intended by the parties; and
>
> 3) The intention of the parties as originally contemplated at the time the agreement or instrument was executed, which must be shown by clear and convincing evidence.

PLEADING CAUSES OF ACTION § 2.23, at 126 (citing, *inter alia*, *Higgins*, *supra*, 310 Md. 532, 530 A.2d 724, *Mattingly v. Houston*, 235 Md. 54, 200 A.2d 160 (1964); and *Moyer v. Title Guarantee Co.*, 227 Md. 499, 177 A.2d 714 (1962)).

In contrast, the elements of a claim for rescission are:

> 1) That [the plaintiff] was induced into assenting to the contract as the result of fraud, negligent misrepresentation, undue influence or duress, or there was a material breach by the other party, or there was a mutual or unilateral mistake in contracting;
>
> 2) That he or she returned the consideration or was unconditionally willing to return to the other party both the consideration that was given and any benefits received under the contract;
>
> 3) That he or she exercised the right to rescind promptly and did not treat the contract as a continuing obligation; and
>
> 4) That he or she gave notice of the intention to rescind.

PLEADING CAUSES OF ACTION § 2.24, at 130 (citing *Md. Port Admin. v. John W. Brawner Contracting Co.*, 303 Md. 44, 492 A.2d 281 (1985); *Plitt v. McMillan*, 244 Md. 450, 223 A.2d 772 (1966); *Hale v. Hale*, 66 Md. App. 228, 503 A.2d 271 (1986); *Bagel Enter., Inc. v. Baskin & Sears*, 56 Md. App. 184, 467 A.2d 533 (1983); and *Cutler v. Sugarman Org., Ltd.*, 88 Md. App. 567, 596 A.2d 105 (1991)).

With respect to reformation or rescission on the basis of mutual mistake, Maryland courts recognize a "general rule . . . that a mistake of law in the making of an agreement is not a ground for reformation" or rescission. *Hoffman v. Chapman*, 182 Md. 208, 213, 34 A.2d 438, 441 (1943). Ordinarily, the mutual mistake must be one of fact. *Id.* The Maryland Court of Special Appeals has described the foregoing quotation from *Hoffman* as "loose dicta," and opined, based on an analysis of prior Maryland case law and modern treatises, that "the correct rule of law is that even if the mutual mistake is one of law," reformation or rescission may be awarded in some circumstances. *Hearn v. Hearn*, 177 Md. App. 525, 542, 936 A.2d 400, 410 (2007). However, in *Janusz v. Gilliam*, 404 Md. 524, 947 A.2d 560 (2008), the Maryland Court of Appeals reiterated (albeit without citing *Hearn*) that a "mutual mistake of law made by the parties is not, as a matter of law, grounds for rescission," at least where "both parties were represented by counsel in the negotiation of the Agreement, [and so] were on an equal footing to know or learn what relevant law applied to their interests." *Id.* at 536-37, 947 A.2d at 567. "'Although reformation requires that the mistake be mutual, rescission may be granted whether the mistake be that of one or of both of the parties.'" *Md. Port Admin.*, *supra*, 303 Md. at 56, 492 A.2d at 287 (quoting *Baltimore v. DeLuca-Davis Co.*, 210 Md. 518, 526, 124 A.2d 557, 561 (1956)).

Claims for reformation or rescission must be proved by clear and convincing evidence. *See, e.g.*, *Faller v. Faller*, 247 Md. 631, 636, 233 A.2d 807, 809 (1967) (rescission); *LaSalle Bank, N.A. v. Reeves*, 173 Md. App. 392, 412, 919 A.2d 738, 751 (reformation), *cert. denied*, 400 Md. 649, 929 A.2d 891 (2007). "'[N]o party has a right to rescind or modify a contract merely because he finds, in the light of changed conditions, that he has made a bad deal.'" *Harford County v. Town of Bel Air*, 348 Md. 363, 384, 704 A.2d 421, 431 (1998) (citation omitted). "'Equity reforms an instrument not for the purpose of relieving against a hard or oppressive bargain, but simply to enforce the actual agreement of the parties to prevent an injustice which would ensue if this were not done.'" *Hous. Auth. of College Park v. Macro Housing, Inc.*, 275 Md. 281, 287, 340 A.2d 216, 219 (1975) (citation omitted).

Both Resource and the Mariner Defendants seize on the fact that plaintiff has captioned Count 4 and Count 7 as claims for "Breach of Contract," and argue that Ms. Wiseman cannot assert a contract-based claim against them because she is not a party to any contract or instrument to which they are also party. Rather, as defendants see it, neither Resource nor either of the the Mariner Defendants is a party to the Life Estate Deed, which was a conveyance between Mr. Wiseman and Ms. Wiseman, and Ms. Wiseman is not a party to the Note or Deed of Trust, both of which were executed only by Mr. Wiseman.

Defendants' argument is understandable, in light of the labels affixed to the counts, but ultimately inapt. Although Count 4 and Count 7 are labeled "Breach of Contract," the substance of the counts seeks rescission or reformation of all of the instruments comprising the reverse mortgage transaction on the basis of mutual mistake. In evaluating a complaint under the pleading standard established by *Iqbal* and *Twombly*, a court must focus on whether the

complaint contains "enough factual matter (taken as true) to suggest" a cognizable cause of action, *Twombly*, 550 U.S. at 556, that "is plausible on its face." *Id.* at 570. How a claim is labeled is of secondary importance, because a reviewing court must disregard "labels and conclusions." *Id.* at 555. There is no indication in the Maryland case law defining the elements of a claim for reformation or rescission that a plaintiff seeking those equitable remedies must be named as a party in the instrument she seeks to rescind or reform in order to be eligible for relief. Such a formal requirement would be incompatible with the essence of a reformation or rescission claim, which is that the formal terms contained in the instrument should be disregarded, because they are a product of mistake or fraud.

The Court's research has not uncovered a Maryland case directly addressing the argument defendants make, nor have defendants provided case law expressly supporting their view. But, the Eighth Circuit made short work of the same argument in *Santucci v. Allstate Life Insurance Co.*, 221 F.3d 1045 (8th Cir. 2000). There, the plaintiff, individually and as administratrix of her late ex-husband's estate, sought to reform an accidental death insurance policy to reflect that her ex-husband, rather than she, was the primary insured under the policy. The issue arose because the ex-husband had been killed in a motorcycle accident, and the insurer refused to pay a death benefit because the ex-husband was neither the primary insured nor (due to his divorce from the plaintiff) the spouse of the primary insured. *See id.* at 1047. After a bench trial, the district court determined that, "[a]lthough the policy named [the plaintiff] as the primary insured such a policy could only be issued to SearsCharge account holders." *Id.* And, "[a]t the time that the policy was issued, [the then-husband] was the only account holder in the household. Premiums were charged to [husband's] Sears credit card and he made the requested

payments." *Id.* Thus, the "district court . . . found by clear and convincing evidence that at the time the contract was formed there was a mutual mistake made by the parties because [wife] not [husband] was named as the primary insured. [The insurer] had clearly intended to insure the SearsCharge account holder, [husband], along with his spouse and children." *Id.*

On appeal, the insurer argued that the district court should not have permitted the ex-husband's estate to seek reformation, because he was not a party to the policy, and should not have permitted the plaintiff to seek reformation in her individual capacity, because the benefit at issue would not accrue to her. Roundly rejecting that proposition, Eighth Circuit said, *id.* at 1048 (internal citation omitted):

> This argument is nothing more than a procedural slip knot designed to keep anyone and everyone out of the case who possibly had standing to seek reformation of the policy. At a minimum the Estate of [the ex-husband] had standing to bring this action. *The right to seek reformation of an insurance policy is not limited to the person or persons named in the policy but may be exercised by a person not so named where reformation is sought to set forth his interest.* . . . [The insurer's] argument that none of the parties has standing to sue for reformation is novel but without merit. (Emphasis added.)

To be sure, a complete stranger to the transaction would lack standing to seek rescission or reformation. But, Ms. Wiseman was not a stranger to the transaction. She was married to Mr. Wiseman, and she, Mr. Wiseman, First Mariner, and Resource are all parties to instruments that form the transaction—they simply are not all listed as parties to the same instruments. Because Ms. Wiseman seeks reformation of the reverse mortgage instruments "to set forth [her] interest," *id.*, she has standing to seek reformation of the documents, despite the fact that she was not a signatory to the Note or Deed of Trust. Of course, she will only be able to obtain reformation if she is able to prove the claim, which will require her to demonstrate, by clear and convincing evidence, the intended form of the instruments. But, for defendants to argue that she is not

entitled to the opportunity to prove that she was intended to be listed a party to the instruments because she was not listed as a party to the instruments is question begging.

Resource also argues that, having acted only as a settlement agent, it was not a party to the transaction at all. Resource is mistaken, in my view. In addition to acting as the settlement agent, Resource was named as the trustee in the Deed of Trust and is therefore a party to that instrument. "'The parties to a deed of trust to secure [property] are the grantor (debtor), the grantee (trustee), and the *cestui que trust* (creditor).'" *Chicago Title Ins. Co. v. Mary B.*, 190 Md. App. 305, 314, 988 A.2d 1044, 1049 (quoting Richard M. Venable, THE LAW OF REAL PROPERTY AND LEASEHOLD ESTATES IN MARYLAND at 253 (1892)), *cert. granted*, 415 Md. 38, 997 A.2d 789, *cert. dismissed*, 417 Md. 384, 10 A.3d 199 (2010). Therefore, it is a necessary party to plaintiff's claims for reformation of the Deed of Trust.[16]

The Mariner Defendants level two additional arguments against plaintiff's reformation and rescission claims, but neither has merit. First, the Mariner Defendants argue that plaintiff fails clearly to allege the original intention of the parties. *See* Mariner Motion at 27. It is hard to fathom the basis for this assertion (on which the Mariner Defendants do not elaborate), given that the complaint iterates many times the Wisemans' intent to remain in the Residence for the rest of

---

[16] As indicated, Resource is a necessary party to the reformation claims because it is a party to the Deed of Trust. This is not inconsistent with the fact that plaintiff's complaint fails to state a claim that Resource is liable for fraudulent concealment. Although fraudulent concealment is one of plaintiff's asserted grounds for reformation, all of the parties to the document she seeks to reform are necessary parties, even if they are not liable as fraudfeasors. *See, e.g.*, *Albert v. Hamilton*, 76 Md. 304, 310, 25 A. 341, 343 (1892) ("These complainants were proper and necessary parties to [the] suit . . . , inasmuch as it sought the rescission of a deed of which they were comakers . . . ."); *Trupp v. Wolff*, 24 Md. App. 588, 622, 335 A.2d 171, 191 ("'All the parties to a contract are ordinarily indispensable parties to a bill in equity for . . . its rescission and cancellation . . . . The recision [sic] of an agreement requires the presence of all claiming property through such agreement.'") (citation omitted), *cert. denied*, 275 Md. 757 (1975).

their lives, without the need for a mortgage payment, which Pastore allegedly told them was possible with the reverse mortgage he brokered. The Mariner Defendants advert to the clear and convincing standard of proof applicable to reformation claims, but the standard of proof, although it will be relevant at the summary judgment stage or at trial, has no bearing at the motion to dismiss stage, at which there is no evidence to evaluate. *See, e.g.*, *United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 933 (9th Cir. 2013) ("Of course, the Union would have to substantiate its allegations by clear and convincing evidence at the summary judgment phase, or perhaps at a trial. Because we deal only with this case at the motion to dismiss stage, we need conclude only that the Union's allegations state a plausible claim upon which relief can be granted.").

Second, the Mariner Defendants argue that plaintiff fails to state a claim for rescission because she has not averred that she returned the consideration or was unconditionally willing to return the consideration, so as to satisfy the second element of a rescission claim, and has not averred that she exercised the right to rescind promptly, so as to satisfy the third element. But, the only instrument that plaintiff seeks to rescind is the Life Estate Deed, to which the Mariner Defendants are not parties and for which they paid no consideration. Moreover, according to the allegations of the complaint, as soon as MetLife declared default following Mr. Wiseman's death, Ms. Wiseman asserted her present position, which she has consistently maintained. Therefore, I cannot conclude, on the basis of the pleadings, that plaintiff failed to exercise her right to rescind promptly.

<u>E.  Negligence</u>

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'"  *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen'l Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *accord Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques*, *supra*, 307 Md. at 531, 515 A.2d at 758) (alterations in *Schultz*).

Plaintiff alleges that Pastore and First Mariner "owed a duty to the Wisemans to produce or obtain a reverse mortgage that met their desire to be able to remain in their home until their respective deaths free from the obligation to pay periodic mortgage installment payments." Amended Complaint ¶ 89.

As already discussed, under the economic loss rule, Maryland courts require the parties to be in contractual privity or its equivalent in order to impose a duty in tort, where the risk of injury involves only monetary loss.  Resource argues that it cannot be liable for negligence because it owed no duty to plaintiff, given that Ms. Wiseman and Resource were not in contractual privity or its equivalent.  For the same reason that Resource had no duty as a matter

of law to undertake affirmative disclosures, in the context of the fraudulent concealment tort, Resource had no duty of care applicable here for purposes of a negligence claim.

The Mariner Defendants concede that that "[c]ontractual privity or its equivalent can be assumed between [Ms. Wiseman] and the [Mariner] Defendants" because "Mr. Wiseman was in privity with the [Mariner] Defendants as a party to the Note and [Deed of Trust], and Mr. Wiseman and [Ms. Wiseman] were in privity as husband and wife, and in any event, [Ms. Wiseman] executed the Life Estate Deed in connection with Mr. Wiseman entering into the Note and [Deed of Trust]." Mariner Motion at 14. Nevertheless, the Mariner Defendants insist that plaintiff fails to plead a breach of a duty owed to her and, moreover, fails to aver that the alleged negligence caused actual injury or loss.

The Mariner Defendants' claim regarding the duty element is predicated on a statement in *Yousef v. Trustbank Savings, F.S.B.*, 81 Md. App. 527, 568 A.2d 1134 (1990). There, in discussing the economic loss rule, as derived from *Jacques*, the Maryland Court of Special Appeals stated: "Where, as here, the alleged breach of duty creates a risk of economic loss only, tort liability may be imposed based upon contractual privity or its equivalent. Before liability may be imposed, however, there must have been *a breach of the duty owed under the terms of the contract*." *Id.* at 536, 568 A.2d at 1138 (citing *Jacques*, 307 Md. at 531, 515 A.2d 756) (internal citations omitted) (emphasis added). Seizing on this language, the Mariner Defendants argue that plaintiff has failed to plead "that Defendants have breached a duty owed under the terms of a contract." Mariner Motion at 15.

*Yousef* relied on *Jacques* for the proposition that, in a tort claim subject to the economic loss rule, the duty applicable to the claim must be a duty owed under the terms of a contract.

But, *Jacques* does not state that proposition. To the contrary, the *Jacques* Court said: "The duty with which we are here concerned is a duty *imposed by law as a matter of sound policy*, for the violation of which a person may be held to respond in damages in tort." *Jacques*, 307 Md. at 533, 515 A.2d at 759 (emphasis added). Further, the court said: "'The mere negligent breach of a contract, *absent a duty or obligation imposed by law independent of that arising out of the contract itself*, is not enough to sustain an action sounding in tort.'" *Id.* at 534, 515 A.2d at 759 (emphasis added) (citation omitted). The language from *Yousef* on which the Mariner Defendants rely has been reiterated on only one other occasion, again by the Court of Special Appeals. *See Hrehorovich v. Harbor Hosp. Ctr.*, *supra,* 93 Md. App. at 798, 614 A.2d at 1034.

Subsequent case law from the Maryland Court of Appeals makes clear that the statement in *Yousef* was an inaccurate statement of the law. *See, e.g.*, *Walpert*, *supra*, 361 Md. at 682, 693, 762 A.2d at 602, 608 (recognizing tort liability of accountants "for negligence and negligent misrepresentation to parties with whom they have no contractural [sic] relationship," where accountants are on notice of "the purpose for which [their] work product is to be used, who is intended at the time of the engagement to use it for that purpose, and some connection with that party that is the equivalent of privity, *such as knowledge of that party's reliance*") (emphasis added) (internal citation omitted). Accordingly, it is unnecessary for plaintiff to allege a duty imposed by the terms of a contract in order to assert a viable negligence claim against the Mariner Defendants.

The Mariner Defendants also assert that plaintiff fails to allege any compensable injury, an element of the negligence tort. Plaintiff counters that, among other things, Ms. Wiseman "has suffered severe emotional distress and mental anguish to such an extent that she [is] fearful of

answering her phone or opening the front door without other family present." Mariner Opp. at 15. As the Maryland Court of Appeals explained in *Hoffman v. Stamper*, 385 Md. 1, 32-38, 867 A.2d 276, 295-98 (2005), Maryland adheres, in both negligence cases and fraud cases, to the so-called "modern rule" articulated in *Vance v. Vance*, 286 Md. 490, 408 A.2d 728 (1979), which permits "recovery of damages for emotional distress if there was at least a 'consequential' physical injury," in the sense that "'the injury for which recovery is sought is capable of objective determination.'" *Hoffman*, 385 Md. at 34, 867 A.2d at 296 (quoting *Vance*). This "physical" injury standard permits recovery for "such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs," *id.* at 34–35, 867 A.2d at 296, but excludes recovery "based on the plaintiff simply saying, 'This made me feel bad; this upset me.'" *Id.* at 34, 867 A.2d at 296. At the pleading stage, I cannot conclude, as a matter of law, that plaintiff has failed to sufficiently allege damages.

### F.  Negligent Misrepresentation

The tort of negligent misrepresentation arises "when the defendant owes a duty of care in communicating information to the plaintiff and that duty is breached, causing pecuniary or personal injury to the plaintiff." *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 11, 756 A.2d 548, 553 (2000). The tort consists of the following elements:

> "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;
>
> (2) the defendant intends that his statement will be acted upon by the plaintiff;
>
> (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Lloyd*, *supra*, 397 Md. at 136, 916 A.2d at 273 (citation and some internal quotation marks omitted).

Resource argues that plaintiff has failed to allege that it made any misrepresentations to plaintiff, or that it owed plaintiff a duty of care. For all of the reasons already expressed, I agree with Resource and will dismiss the negligent misrepresentation claim against it.

The Mariner Defendants' arguments against the negligent misrepresentation count are also largely repetitive of arguments already addressed (*i.e.*, that the Mariner Defendants made no misrepresentations to plaintiff; that the Mariner Defendants had no contract-based duty to plaintiff; that the Counseling Certificate negates justified reliance). I reject those arguments for the reasons already discussed.

In addition, the Mariner Defendants contend that the complaint fails to plead sufficiently that they intended for plaintiff to rely on their alleged misrepresentations, that they knew that plaintiff was likely to rely on the misrepresentations, and that plaintiff's damages were caused by their misrepresentations. *See* Mariner Motion at 16-17. Knowledge and intent may be pleaded in general terms. *See* Fed. R. Civ. P. 9(b). Moreover, knowledge, intent, and causation "'can rarely be established by direct evidence, and must often be proved circumstantially and by inference.'" *Laws v. Thompson*, 78 Md. App. 665, 678, 554 A.2d 1264, 1271 (citation omitted), *cert. denied*, 316 Md. 428, 559 A.2d 791 (1989). At the motion to dismiss stage, taking the facts in the light most favorable to plaintiff, I am satisfied that plaintiff's pleading of knowledge, intent, and causation is sufficient to state a plausible claim.

<u>G.  Consumer Protection Act</u>

Count 3 of the complaint, lodged only against the Mariner Defendants, asserts the violation of the Maryland CPA.  In a suit by a private litigant, the CPA authorizes the plaintiff to "recover for injury or loss sustained by him as the result" of an unfair or deceptive trade practice. C.L. § 13-408(a).

In C.L. § 13-303, the CPA prohibits engaging in an unfair or deceptive trade practice in the following scenarios:

(1) The sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services;

(2) The offer for sale, lease, rental, loan, or bailment of consumer goods, consumer realty, or consumer services;

(3) The offer for sale of course credit or other educational services;

(4) The extension of consumer credit;

(5) The collection of consumer debts; or

(6) The purchase or offer for purchase of consumer goods or consumer realty from a consumer by a merchant whose business includes paying off consumer debt in connection with the purchase of any consumer goods or consumer realty from a consumer.

Among other things, any of the following constitutes an unfair or deceptive trade practice under the statute, C.L. § 13-301:

(1) [A f]alse, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2) [A r]epresentation that . . . Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\*    \*    \*

(3) Failure to state a material fact if the failure deceives or tends to deceive;

\*    \*    \*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a

consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service . . . .

The CPA also establishes that, by definition, the violation of several other enumerated Maryland statutes constitutes unfair or deceptive trade practices proscribed by the CPA. *See generally* C.L. § 13-301(14) (enumerating incorporated statutes).

A "consumer" is defined under the CPA as "an actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit." C.L. § 13-101(c)(1). "'Consumer credit', 'consumer debts', 'consumer goods', 'consumer realty', and 'consumer services' mean, respectively, credit, debts or obligations, goods, real property, and services which are primarily for personal, household, family, or agricultural purposes." C.L. § 13-101(d).

In her complaint, plaintiff alleges that the Mariner Defendants engaged in virtually all of the unfair or deceptive trade practices enumerated above. In particular, she asserts that the Mariner Defendants "represented to the Wisemans that their reverse mortgage product has a characteristic, use, or benefit . . . that it did not have, namely that Ruth Wiseman would not be dispossessed of the Wiseman Residence during her lifetime," Amended Complaint ¶ 63; that the Mariner Defendants made a false or misleading statement "which deceived or tended to deceive, namely that Ruth Wiseman would not be dispossessed of the Wiseman Residence during her lifetime by executing the Life Estate Deed as an incident to the reverse mortgage transaction," *id.* ¶ 64; and that the Mariner Defendants violated the CPA by violating the Maryland Reverse Mortgage Act. *Id.* ¶ 66.

It is plain from the CPA's statutory text that several of its provisions do not apply. As the Mariner Defendants point out, the only qualifying conduct they engaged in was the "extension of

consumer credit," under C.L. § 13-303(4). And, conduct with respect to consumer credit is excluded from the text of several of the definitions of unfair or deceptive trade practices. *See* C.L. § 13-301(2), (9). Moreover, as the Mariner Defendants point out, the Reverse Mortgage Act is not one of the statutes enumerated in C.L. § 13-301(14), and so violation of the Reverse Mortgage Act is not, *ipso facto*, a violation of the CPA.

Nevertheless, in the context of extension of consumer credit, several CPA provisions are applicable, including the making of false or misleading representations that have the "capacity, tendency, or effect of deceiving or misleading consumers," C.L. § 13-301(1), and the "[f]ailure to state a material fact if the failure deceives or tends to deceive." C.L. § 13-301(3). Maryland courts consider two components in analyzing whether a statement violates C.L. § 13-301(1). A misrepresentation "falls within the scope of C.L. § 13-301(1) if it is 'false' or 'misleading' *and* it has 'the capacity, tendency, or effect of deceiving or misleading' consumers." *McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 577, 723 A.2d 502, 510 (emphasis in original), *cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

In Maryland, whether a statement is "misleading" is judged from the point of view of a reasonable, but unsophisticated consumer. *See Luskin's, Inc. v. Consumer Protection Div.*, 353 Md. 335, 356-57, 726 A.2d 702, 712 (1999). In assessing the "capacity, tendency, or effect" of a statement to deceive or mislead, courts consider whether "a significant number of unsophisticated consumers would find [the] information [at issue] important in determining a course of action." *Green v. H & R Block, Inc.*, 355 Md. 488, 524, 735 A.2d 1039, 1059 (1999). Put another way, a court should ask whether the information is "'important to consumers and, hence, likely to affect their choice.'" *Luskin's*, 353 Md. at 359, 726 A.2d at 713 (citation

omitted).  In this respect, a statement "cannot be viewed in a vacuum"; rather, it must be viewed in the context in which it was made, along with other representations to the consumer.  *McGraw*, 124 Md. App. at 580, 723 A.2d at 511.

The Mariner Defendants argue that plaintiff's complaint fails to state a claim for any CPA violation because, they contend, Ms. Wiseman was not a "consumer," within the meaning of the statute.  As the Mariner Defendants see it, they extended consumer credit only to *Mr.* *Wiseman*.  Because Ms. Wiseman did not sign the Note or Deed of Trust, they reason, she does not come within the protection of the statute.

The Mariner Defendants' argument overlooks that the definition of a "consumer" under the CPA includes "an actual *or prospective* . . . recipient of . . . consumer credit."  C.L. § 13-101(c)(1) (emphasis added).  Although First Mariner ultimately executed the Note only with Mr. Wiseman, the complaint clearly alleges that the Mariner Defendants dealt prospectively with the Wisemans as a couple and offered to extend consumer credit to both of them, including obtaining an application from the couple.  Accordingly, Ms. Wiseman comes within the CPA's definition of a "consumer."[17]

Plaintiff also contends that the Mariner Defendants conspired to violate the CPA.  I agree with the Mariner Defendants that the complaint fails to allege facts suggesting that the Mariner Defendants conspired with any other entity (including Resource or MetLife) and that the intracorporate conspiracy doctrine precludes as a matter of law any claim that First Mariner and Pastore conspired with each other.  *See, e.g.*, *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342,

---

[17] Because Ms. Wiseman was a "prospective . . . recipient of . . . consumer credit," C.L. § 13-101(c)(1), I need not resolve whether she could also state a CPA claim even if the Mariner Defendants had marketed the reverse mortgage only to Mr. Wiseman from the outset.

352 (4th Cir. 2013) ("The intracorporate conspiracy doctrine recognizes that a corporation cannot conspire with its agents because the agents' acts are the corporation's own.").

The Mariner Defendants' remaining arguments against liability under the CPA mirror their arguments against plaintiff's fraud claims: that the complaint fails to allege the materiality of their alleged misrepresentations or omissions; that it fails to allege plaintiff's reasonable reliance on the misrepresentations or omissions; and that it fails to comport with the heightened pleading requirements of Rule 9(b). I reject these arguments for the same reasons already discussed.[18]

## H. Fair Debt Collection Claims

In Count 9, plaintiff alleges violation of the FDCPA and MCDCA, *i.e.*, federal and state fair debt collection law. Both the FDCPA and MCDCA impose a variety of obligations and potential liabilities on debt collectors. Count 9 names as defendants only Resource and MetLife. However, as Resource points out, in the text of Count 9, plaintiff *expressly disavows* Resource's liability. The complaint states: "Plaintiff notes that as of the date of this filing Defendant Resource has not taken any action in violation of the [MCDCA] or the FDCPA, but is named herein in its capacity as 'Trustee' of the operative deeds of trust out of an abundance of caution, and if/when injunctive relief is sought incident to foreclosure proceedings." Amended Complaint ¶ 100. At the risk of stating the obvious, a cause of action that affirmatively states

---

[18] In the Mariner Defendants' argument against the materiality of the alleged misrepresentations or omissions, one contention is noteworthy: they posit that the complaint fails to allege that Ms. Wiseman made any "choice" in response to the misrepresentations and so cannot demonstrate that the information was "'important to [Ms. Wiseman] and, hence, likely to affect [her] choice.'" *Luskin's*, 353 Md. at 359, 726 A.2d at 713 (citation omitted). This contention is puzzling. In my view, the complaint clearly alleges that the Wisemans made a choice to enter into the reverse mortgage transaction, including Ms. Wiseman's execution of the Life Estate Deed, on the basis of Pastore's representations.

that the defendant has not violated the applicable statute fails to state a claim upon which relief can be granted for violation of the statute. Accordingly, Count 9 will be dismissed as to Resource.[19]

### I. "Statutory Violations Generally"

In Count 10, titled "Statutory Violations Generally," plaintiff asserts that all four defendants violated three statutory provisions: the Maryland Reverse Mortgage Act, the federal HECM statute (and its implementing regulations), and the federal Truth In Lending Act. She seeks money damages for the alleged statutory violations. *See* Amended Complaint ¶ 113. In her opposition to Resource's motion, plaintiff "consents to the dismissal" of Count 10 against Resource. Resource Opp. at 2. Accordingly, I need only consider Count 10 as against the Mariner Defendants.

### 1. Reverse Mortgage Act

As the Mariner Defendants point out, and as plaintiff concedes, *see* Mariner Opp. at 16, plaintiff fails to state a claim upon which relief can be granted under the Reverse Mortgage Act because the statute had not yet been enacted when the Wisemans entered into the reverse mortgage transaction at issue. As discussed, closing on the reverse mortgage took place on June 17, 2009. The Reverse Mortgage Act was enacted into Maryland law on May 20, 2010, as Chapters 622 and 623 of the 2010 Maryland Laws. The Act came into effect on October 1, 2010, *see* 2010 Md. Laws ch. 622 § 3, ch. 626 § 3, and expressly provided: "[T]his Act shall be construed prospectively to apply only to reverse mortgage loans applied for on or after the

---

[19] Plaintiff suggests that it is proper to name Resource as an "Interested Party" to Count 9. Although Resource is a necessary interested party to Counts 4, 5, and 7, discussed *supra*, seeking reformation and/or rescission, it is unclear what role Resource would play as an interested party in a fair debt collection claim under the FDCPA or the MCDCA.

effective date of this Act." 2010 Md. Laws ch. 622 § 2, ch. 626 § 2. Accordingly, it has no application here.

### 2. *Home Equity Conversion Mortgage statute*

The HECM statute, 12 U.S.C. § 1715z-20, and its implementing regulations, *see* 24 C.F.R. part 206, require and authorize HUD to regulate the offering of reverse mortgages. The Mariner Defendants contend, however, that the statute does not authorize a private right of action. Plaintiff concedes that she cannot pursue a private right of action under the HECM statute. *See* Mariner Opp. at 16.[20] Accordingly, her claims under that statute will be dismissed.

### 3. *Truth In Lending Act*

Section 1648 of 15 U.S.C., a provision of the TILA, also governs reverse mortgages. Specifically, it requires the "creditor" under a reverse mortgage to "disclose to the consumer in conspicuous type a good faith estimate of the projected total cost of the mortgage to the consumer expressed as a table of annual interest rates," no later than three days before closing. 15 U.S.C. § 1648(a). The disclosure must include, *id.*:

> (1) statements of the annual interest rates for not less than 3 projected appreciation rates and not less than 3 credit transaction periods, as determined by the Bureau, including—
>
>> (A) a short-term reverse mortgage;
>>
>> (B) a term equaling the actuarial life expectancy of the consumer; and
>>
>> (C) such longer term as the Bureau deems appropriate; and
>
> (2) a statement that the consumer is not obligated to complete the reverse mortgage transaction merely because the consumer has received the disclosure required under this section or has signed an application for the reverse mortgage.

---

[20] Nevertheless, plaintiff maintains that the HECM statute "remains a vital backdrop to the action generally." Mariner Opp. at 16.

The statute also lists several factors that the creditor must "take into account" in "determining the projected total cost of the mortgage to be disclosed to the consumer." *Id.* § 1648(b); *see id.* § 1648(b)(1)-(4) (enumerating factors).

The Mariner Defendants argue that the complaint fails to specify what statutorily-required disclosures they failed to provide or any other facts in support of the claim. Moreover, they contend that any claim under the TILA is time-barred under 15 U.S.C. § 1640(e).

Section 1640 authorizes a civil action for damages against "any creditor who fails to comply with any requirement imposed under" sections 1631–1651 and 1666–1667f (*i.e.*, Parts B, D, and E of the TILA), including § 1648. However, § 1640(e) provides, with exceptions not relevant here, that an "action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, *within one year from the date of the occurrence of the violation* . . . ." (Emphasis added.) Accordingly, because plaintiff filed suit well over a year after the closing on the reverse mortgage, the Mariner Defendants reason that the claim is barred by the statute of limitations.[21]

Plaintiff argues that case law interpreting TILA holds that its limitations period does not begin to run until the plaintiff became "aware, or should have been aware" of the violation. *Pricer v. Deutsche Bank*, 842 F. Supp. 2d 162, 166 (D.D.C. 2012). In her view, she was not aware of the violations until MetLife began sending her debt acceleration notices after Mr. Wiseman's death in December 2011, and she filed suit within one year thereafter, in June 2012.

---

[21] In addition to suits for money damages authorized by 15 U.S.C. § 1640, TILA authorizes an obligor to rescind certain consumer credit transactions for TILA violations within three years after the consummation of the transaction. *See* 15 U.S.C. § 1635. However, plaintiff does not seek relief under this section. Accordingly, I need not consider its applicability.

Unlike some statutes of limitations, TILA's statute of limitations is not expressly based on when a claim "accrues." The concept of accrual is ordinarily thought to include a discovery rule, by which accrual cannot occur until the plaintiff has (or should have) "possession of the critical facts that he has been hurt and who has inflicted the injury." *United States v. Kubrick*, 444 U.S. 111, 122 (1979) (discussing discovery rule in the context of the Federal Tort Claims Act, which contains a statute of limitations requiring notice to the government "within two years after such claim accrues"). However, as noted, TILA's limitations provision begins running on the "date of the occurrence of the violation." 15 U.S.C. § 1640(e).

To be sure, the equitable doctrine of fraudulent concealment is "'read into every federal statute of limitation.'" *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 177-78 (4th Cir. 2007) (quoting *Holmberg v. Armbrecht*, 327 U.S. 392, 397 (1946)). Decisions in this district have held that TILA's limitations period can be equitably tolled on the basis of fraudulent concealment. *See, e.g.*, *Kerby v. Mortg. Funding Corp.*, 992 F. Supp. 787, 797 (D. Md. 1998); *Davis v. Edgemere Fin. Co.*, 523 F. Supp. 1121, 1125 (D. Md. 1981); *accord Elman v. JP Morgan Chase Bank, NA*, Civ. No. PJM-10-31, 2010 WL 2813351, at *2 (D. Md. July 13, 2010). However, the doctrine of fraudulent concealment requires the plaintiff to establish three elements: "'that (1) the party pleading the statute [of limitations] fraudulently concealed facts which are the basis of a claim, and that (2) the claimant failed to discover those facts within the statutory period, despite (3) the exercise of due diligence.'" *GO Computer*, 508 F.3d at 178 (citation omitted).

As the late Judge Kaufman explained in *Davis*, 523 F. Supp. at 1126:

Application of the fraudulent concealment doctrine in the context of the disclosure requirements of the TILA requires more than mere nondisclosure . . . .

Otherwise, in a context in which nondisclosure is the gravamen of the violation, then just about every failure by defendant to disclose as required by the TILA would seemingly bring about tolling and would tend to eviscerate the limitations provision set forth in § 1640(e) . . . .

There is no indication that the Mariner Defendants took any action to fraudulently conceal their alleged failure to make disclosures required under the TILA. Accordingly, I conclude that plaintiff's TILA claim is time-barred.

Even if the claim were not time-barred, it fails on the merits. In response to the Mariner Defendants' contention that the complaint fails to allege what statutorily-required disclosures they failed to make, plaintiff argues that the Mariner Defendants violated the TILA by "represent[ing] to Ruth [Wiseman] that her participation in their recommended product would allow her to live in her home" after Mr. Wiseman's death. Mariner Opp. at 16. But, the TILA does not impose a general anti-fraud regime on reverse mortgage transactions. Rather, § 1648 requires a specific disclosure: "a good faith estimate of the projected total cost of the mortgage to the consumer," calculated and presented on a specified basis. 15 U.S.C. § 1648(a). Plaintiff's complaint fails to allege that the Mariner Defendants did not provide the disclosure required by the TILA, and so her TILA claim will be dismissed.

## J. Aiding & Abetting

Count 11, the final count of plaintiff's complaint, is asserted only against Resource. It contends that Resource aided and abetted the torts of the Mariner Defendants, as principal tortfeasors. According to plaintiff, Resource "acted with knowledge of the scheme to damage Plaintiff, or should have known of the potential harm to Plaintiff." Amended Complaint ¶ 116. She elaborates: "By way of Resource's preparation of the transactional documents, disbursement of funds, and conduct of the settlement of the transaction in the Wiseman Residence such as to

accommodate the immobility of the then visibl[y] ailing John Wiseman, Resource was keenly aware that Ruth Wiseman's removal from title could expose her to the risk of the loss of her home." *Id.* ¶ 117.

Both plaintiff and Resource look to *Saadeh v. Saadeh*, 150 Md. App. 305, 819 A.2d 1158, *cert. denied*, 376 Md. 52, 827 A.2d 114 (2003), for the elements of civil liability for aiding and abetting in Maryland. In *Saadeh*, the Maryland Court of Special Appeals stated, *id.* at 325, 327-28, 819 A.2d at 1170, 1171:

> Maryland recognizes that one may be held civilly liable in tort as an aider and abettor to a tort committed by another.
>
> * * *
>
> [W]hile proof of criminal aiding and abetting requires a heightened showing that the aider and abettor had the purpose to accomplish the underlying criminal act, proof of tortious aiding and abetting requires a lesser showing that the aider and abettor engaged in conduct knowing that the criminal (or tortious) act would be the natural consequence of his conduct. . . . [A]ider and abettor tort liability is predicated upon the wrongdoer's engaging in acts of encouragement or assistance to the person actually committing the wrongful act. To be liable in tort, the aider or abettor must have engaged in assistive conduct that he would know would contribute to the happening of that act.

Resource contends that plaintiff's allegations as to its knowledge are "completely conclusory." Resource Motion at 30. In its view, the fact that Resource knew that Mr. Wiseman was elderly, "ailing," and "immobile" does not mean that Resource knew or should have known of a scheme to damage Ms. Wiseman or the possibility that she would be harmed. *Id.* Resource notes that "homeowners in reverse mortgage transactions are inevitably elderly, given the statutory requirements for such loans," and poor health is "not an uncommon circumstance among the elderly population of homeowners that qualifies for reverse mortgages." *Id.* at 30 n.5.

I agree with Resource that, without more, the complaint does not assert a claim on which relief can be granted for aider and abettor liability. Assuming the truth of plaintiff's claims of

fraudulent inducement against the Mariner Defendants, there is no factual allegation in the complaint to suggest that Resource was aware of the Mariner Defendants' alleged misrepresentations. As Resource forcefully points out, Resource Reply at 20:

> There are no allegations in the [complaint] that Defendant Pastore told Resource of any pre-settlement representations regarding the transaction he may have made to Plaintiff. There are no allegations in the [complaint] that Resource had knowledge from any other source regarding Defendant Pastore's alleged presettlement misrepresentations to Plaintiff. There are no allegations in the [complaint] that Plaintiff had any communications or interactions with Resource prior to settlement, much less that Plaintiff ha[d] any pre-settlement communications with Resource through which Plaintiff made Resource aware of her supposed subjective "understanding." Likewise, there are no allegations in the [complaint] regarding substantive communications by Plaintiff to Resource's representative at the settlement, much less allegations that Plaintiff told Resource's representative about her "understanding" or that Plaintiff told Resource's representative anything regarding her future "intentions" in terms of living in the home if her husband died before her. (Emphasis and internal citations omitted.)

In the absence of express allegations that Resource had knowledge of either Ms. Wiseman's expectation of residing in the home after Mr. Wiseman's death or First Mariner's representation that her expectation would be met, plaintiff is left with the contention that Resource should have known of the Mariner Defendants' alleged tort simply from the terms of the transaction and Mr. Wiseman's evident age and physical frailty. If aider and abettor liability could be imposed on such a flimsy basis, it would result in an end run around the analysis of whether Resource owed Ms. Wiseman a duty in tort directly under the parameters of *Jacques* and *Iglesias*—even though the same factual scenario is insufficient to generate a duty in tort as a principal, it would be sufficient to impose a duty to intuit from the circumstances the tortious conduct of others. *Iglesias* negates that proposition. Accordingly, I will dismiss Count 11.

**Conclusion**

For the foregoing reasons, I will grant both motions in part and deny them in part. In particular, all substantive claims against Resource will be dismissed, but Resource remains a necessary party to Counts 4, 5, and 7, seeking reformation and/or rescission. Count 1 will be dismissed, without prejudice; plaintiff is granted leave to file a second amended complaint alleging a violation of the Maryland Mortgage Fraud Prevention Act. Counts 2, 4, 5, 6, 7, and 8 will not be dismissed as against the Mariner Defendants. Count 3 also will not be dismissed as against the Mariner Defendants, to the extent that Count 3 asserts violations of the CPA occurring in the "extension of consumer credit." Count 10 will be dismissed as against the Mariner Defendants.

An Order implementing my rulings follows.

Date:  September 23, 2013              _____/s/_____

Ellen Lipton Hollander
United States District Judge